UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
LIANG XIANG XU,

                                Appellant,

                                                          **MEMORANDUM & ORDER**
              - against -                                        20-CV-3215 (PKC)

GREGORY MESSER, as Chapter 11 Trustee of
41-23 Haight Street Realty, Inc.,

                                Appellee.
--------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

Appellant Liang Xiang Xu appeals an order of the United States Bankruptcy Court for the

Eastern District of New York, the Honorable Nancy Hershey Lord presiding.  Over Appellant Xu's

objection, the Bankruptcy Court granted the motion of Appellee Gregory Messer—Chapter 11

Trustee of the Debtor 41-23 Haight Street Realty, Inc.'s estate—to retain deposits paid in

connection with a contemplated sale of certain real properties of the Debtor.  For the reasons below,

the Bankruptcy Court's order with respect to Appellant Xu is affirmed.[1]

## BACKGROUND

On June 4, 2019, several creditors filed an involuntary petition under Chapter 11 of the

Bankruptcy Code against the Debtor in the Bankruptcy Court.  (R. 3.)[2]  By order of the Bankruptcy

Court on August 12, 2019, Appellee was appointed the Chapter 11 Trustee of the Debtor's estate

("Appellee-Trustee").  (R. 6.)  On December 12, 2019, the Bankruptcy Court approved the

---

[1]  A companion appeal of the Bankruptcy Court's order brought by another objecting party, Mei Yang Ko, is also before this Court.  *See Ko v. Messer*, Case No. 20-CV-2866 (PKC).  Ko's appeal raises different issues and is the subject of a separate decision.

[2]  Citations to "R." refer to the consecutively paginated record transmitted from the Bankruptcy Court and filed electronically on the Court's CM/ECF docketing system at Dkt. 2.

retention of Maltz Auctions, Inc., d/b/a Maltz Auctions, and Rosewood Realty Group as co-brokers to sell the Debtor's real properties in Queens County (the "Real Property").  (R. 16.)  The Bankruptcy Court subsequently entered an order on March 30, 2020 (the "Sale Procedure Order"), that, among other things, authorized Appellee-Trustee to proceed with a virtual public auction sale of the Real Property, and approved the terms and conditions of sale ("Sale Terms") and the notice of sale.  (R. 20, 48–70.)  Notably, under the Sale Terms, any purchaser is generally required to make an initial deposit ("Deposit"), pay a 4% buyer's premium "within 48 hours after conclusion of the Sale" ("Buyer's Premium"), and "close title to the Real Property at a date that is no more than thirty (30) days after the Sale Date (the 'Closing Date')," although such Closing Date may, at the "sole discretion" of Appellee-Trustee, be extended by 30 days.  (*See* R. 56–57 (formatting in original).)  The Sale Terms also state—in bold, underlined font—that

> **TIME IS OF THE ESSENCE against [any purchaser] and the failure of [any purchaser] to close for any reason whatsoever (except as otherwise provided herein) including its failure to pay the balance of the Purchase Price on the Closing Date, will result in an immediate forfeiture of the Deposit and Buyer's Premium and the termination of such [purchaser's] right to acquire each Real Property under these [Sale Terms] and the Memorandum of Sale.**

(R. 58 (formatting in original).)

On April 9, 2020, the Bankruptcy Court approved an agreement that Appellee-Trustee had entered into with Tu Kang, business partner of Wing Fung Chau a/k/a Andy Chau, and Selena Chau, daughter of Andy Chau (collectively, the "Initial Offerors"), for purchase of the Real Property at a price of $31,000,000.  (R. 21, 121–22.)  After the Bankruptcy Court approved the agreement, however, the Initial Offerors defaulted.  (R. 122.)

Following the default of the Initial Offerors, Appellee-Trustee received an offer from Mei Yang Ko and Appellant Xu for purchase of the Real Property at a price of $27,300,000.  (*See* R. 71–74.)  This offer was reduced to a signed written agreement dated April 20, 2020 (the "Stalking

Horse Agreement"), which incorporated the previously approved Sale Terms and provided that a Deposit of $2,780,000 would be paid to Appellee-Trustee.  (R. 84–85; *see also* R. 86–92 (Sale Terms annexed to the Stalking Horse Agreement and signed by Ko and Appellant).)  Between April 23 and April 28, 2020, Appellee-Trustee received a series of cashier's checks amounting to the full Deposit of $2,780,000.  (R. 285–86, 290–92.)  All of the checks were deposited into the Trustee's account at Mechanics Bank.  (*See* R. 290.)  One of these checks—in an amount of $1,319,000—was remitted from an account at East West Bank in the name of JCBD Investment Inc., a company belonging to Appellant Xu.  (*See* R. 189, 291.)  Appellant Xu thus avers: "I, through my company [JCBD] Investment Inc., paid [Appellee-Trustee] $1,319,000.00 by cashier's check on April 28, 2020[.]"  (R. 189; *see also* Brief of Appellant Liang Xiang Xu in Support of Appeal ("Appellant Br."), Dkt. 4, at 8.)

On April 29, 2020, with the Deposit of $2,780,000 in hand, Appellee-Trustee moved the Bankruptcy Court for an order approving the Stalking Horse Agreement.  (R. 23, 71–83.)  On the same day, the Bankruptcy Court issued an order scheduling a telephone hearing for May 5, 2020.  (R. 23.)  At the May 5 hearing, counsel for Ko, Andy Choi, confirmed to the Bankruptcy Court that Appellant Xu had "pulled out" and Ko was prepared to proceed without Xu.  (*See* R. 300–01.)  The Bankruptcy Court also considered and overruled an objection by the Initial Offerors to approval of the Stalking Horse Agreement.  (*See* R. 306–24.)  Accordingly, on May 8, 2020, the Bankruptcy Court entered an order (the "Stalking Horse Order") approving the Stalking Horse Agreement only as to Ko and naming Ko as the "Stalking Horse Bidder."  (R. 24, 93–96.)  Attached to the Stalking Horse Order was a copy of the Stalking Horse Agreement with Appellant Xu's name and signature crossed out.  (*See* R. 98–106.)  Even though the Stalking Horse Order with the revised Stalking Horse Agreement was entered publicly, Appellant Xu avers that he was unaware

3

at the time that his name had been removed from the Stalking Horse Agreement.  (*See* R. 190; *see also* Appellant Br., Dkt. 4, at 9.)  Indeed, Appellant Xu claims ignorance even though he, Ko, and the Initial Offerors at the time shared the same real estate attorney, Xiangan Gong, Esq.  (*See* R. 21–22 (noting Gong's appearance on behalf of the Initial Offerors at a telephone conference before the Bankruptcy Court on 4/21/2020), R. 189 (Appellant affirming that he and Ko "were represented by the same counsel, Xiangan Gong, Esq.," when the Stalking Horse Agreement was being negotiated in April 2020); *see also* Response Brief of Appellee Gregory M. Messer ("Appellee Br."), Dkt. 6, at 9 ("In fact, the counsel representing the Appellant at that time was Xiangan Gong, Esq., the same counsel, who represented the Initial Offerors.").)[3]

On May 12, 2020, at 11:00 a.m., the co-brokers held a virtual public auction, and "the Stalking Horse Bidder [*i.e.*, Ko] was the successful bidder of the Real Property with a bid of $27,300,000 *plus* the Buyer's Premium and the transfer tax (the 'Purchase Price')."  (R. 110 (formatting in original).)  Appellee-Trustee filed an affirmation the next day confirming the public auction sale of the real Property "to the Stalking Horse Bidder, Mei Yang Ko."  (R. 24, 107.)

On May 14, 2020, the Bankruptcy Court held a hearing shortly after 11:00 a.m. to confirm the results of the sale.  (*See* R. 25, 713.)  During the hearing, counsel for Appellee-Trustee verified that the 4% Buyer's Premium had not yet been paid, despite the 48-hour deadline under the Sale Terms.  (R. 726.)  Ko's counsel, Choi, however, represented that his client was "in the process of" completing a wire transfer of the funds, noting that the funds were "coming from several wires"

---

[3]  Although neither Appellant Xu nor Gong appeared at the May 5, 2020 hearing, Gong did receive electronic notice of the hearing.  (*See* Affidavit of Service, Bankr. Dkt. 149, at 3.)  References to "Bankr. Dkt." refer to documents filed on the Bankruptcy Court's docket in this case, No. 19-bk-43441, that were not included in the record transmittal filed at Dkt. 2 but of which this Court may, and has, taken judicial notice.  *See Tingling v. U.S. Dep't of Educ.*, 611 B.R. 710, 715 (E.D.N.Y. 2020) (collecting cases).

that were being gathered into "one single wire," and it was agreed that Ko would have until the end of the day to wire the funds to cover the Buyer's Premium.  (*See* R. 726–28.)  The Bankruptcy Court explicitly warned Choi: "The terms have to be—as you know, the terms have to be complied with.  And if they're not complied with, there'll be a default declared.  They'll have to come before me.  And the deposit will end up [] with the estate."  (R. 727–28.)  Choi replied, "Okay," and "Yes, Your Honor."  (*Id.*)

Appellant Xu avers—and the record confirms—that he wired $800,000 on May 14, 2020, from the JCBD Investment Inc. account at East West Bank to an account at Rabobank, N.A.[4]  (*See* R. 189, 206; *see also* Appellant Br., Dkt. 4, at 8–9.)  Ultimately, the Buyer's Premium was remitted to Appellee-Trustee in a timely manner, and Appellee-Trustee accordingly "was holding Funds in the amount of $3,822,000 in connection with the sale of the Real Property to [Ko]"—of which $2,119,000 came from Appellant Xu's company JCBD Investment Inc.  (R. 124–25; *see also* Appellant Br., Dkt. 4, at 8–9 ("Appellant, through his company JCBD Investment Inc., paid [Appellee-Trustee] $1,319,000.00 by cashier's check on April 28, 2020 and $800,000.00 by wire transfer on May 14, 2020 for a total of $2,119,000.00 in partial payment of the required deposit.").)[5]

---

[4]  Appellant Xu provides no explanation as to why he wired money to this bank.

[5]  Several times throughout the record Appellant Xu seems to suggest that he funded $2,119,000 of the $2,780,000 Deposit before being unilaterally removed from the Stalking Horse Agreement.  (*See, e.g.*, R. 177 ("Xu, however, objects to the Trustee's request for authorization to retain $2,119,000.00 paid by Xu directly to the Trustee prior to being cut out of the deal by Ko."), R. 178 ("As partial payment of the required $2,730,000.00 deposit in connection with the Stalking Horse Bid Agreement, Xu, through his company JCBD Investment Inc., paid the Trustee $1,319,000.00 by cashier's check on April 28, 2020 and $800,000.00 by wire transfer on May 14, 2020 for a total of $2,119,000.00."); *see also* Appellant Br., Dkt. 4, at 2 ("Appellant was unilaterally removed [from] the applicable agreement, after it was submitted to the Trustee and the Bankruptcy Court, and therefore was not approved as a stalking horse bidder or purchaser, despite funding the majority of the required deposit.").)  The Court finds that any suggestion that Appellant Xu paid $2,119,000 before being removed from the Stalking Horse Agreement is belied by the

On May 19, 2020, after the Buyer's Premium was timely remitted to Appellee-Trustee, the Bankruptcy Court entered an order (the "Sale Confirmation Order") confirming the sale of the Real Property to "the Stalking Horse Bidder," *i.e.*, Ko.  (R. 25, 143–53.)  Among other things, the Sale Confirmation Order found that Ko was "purchasing the Real Property in good faith" and was "a good faith buyer."  (R. 146.)  The Sale Confirmation Order—consistent with the Sale Terms—also ordered:

> The Stalking Horse Bidder shall close title to the Real Property no later than June 11, 2020 (which is no more than thirty (30) days after the date of the Public Auction) (the "Closing Date"), **TIME BEING OF THE ESSENCE**, although such Closing Date may be extended by the Trustee [*i.e.*, Appellee], in his sole discretion and after consultation with the Lender, but such extension of the Closing Date shall not be later than thirty (30) days from the original Closing Date—July 11, 2020, **TIME BEING OF THE ESSENCE**.

> To the extent that the Trustee, in his sole discretion, grants any such extension of the Closing Date, the Purchaser shall provide to the Trustee an additional, non-refundable deposit equal to ten (10%) percent of the Purchase Price in the amount of $2,730,000 (the "Additional Deposit").  The Additional Deposit shall be made by certified check or bank check made payable to "Gregory M. Messer, Chapter 11 Trustee" or by wire in immediately available federal funds.

> The Stalking Horse Bidder shall pay the Additional Deposit, and any other adjustments, as of the original Closing Date, and failure to do so shall be deemed a default under the terms of the Stalking Horse Agreement and the Sale Terms and shall result in the Stalking Horse Bidder's automatic forfeiture of any rights whatsoever to the Deposit, the Additional Deposit and the Buyer's Premium.

> . . .

> Time is of the essence as to the Purchaser's obligation to timely close on the Sale on the Closing Date and the failure of the Purchaser to close for any or no reason whatsoever, including, without limitation, its failure to pay the balance of the Purchase Price on the Closing Date, will result in an immediate forfeiture of the

---

record.  The record is clear that *JCBD Investment Inc.* remitted $1,319,000 by cashier's check to Appellee-Trustee on April 28, 2020, in partial satisfaction of the $2,780,000 Deposit (*see* R. 290–91), and then, on May 14, 2020—after the Bankruptcy Court had entered the Stalking Horse Order naming only Ko as the Stalking Horse Bidder on May 8, 2020, and after the virtual public auction sale had occurred on May 12, 2020—$800,000 was wired from JCBD Investment Inc.'s account at East West Bank to an account at Rabobank, because the Buyer's Premium was due within 48 hours of the public auction sale (*see* R. 189–90, 206, 726–28).

Deposit, any Additional Deposit, and Buyer's Premium and the termination of the right to acquire the Real Property.

(R. 149–51 (formatting in original).)

On June 9, 2020, two days before the original Closing Date, Ko—through counsel—informed Appellee-Trustee that she was not prepared to close because of funding issues and requested a 30-day extension.  (R. 125.)  Appellee-Trustee—also through counsel—advised that he would consent to the extension, provided that Ko: (i) execute an acknowledgement of terms with respect to the requested extension (the "Acknowledgement"); and (ii) deliver an Additional Deposit of $2,730,000, via wire transfer, by June 10, 2020.  (*Id.*)

On June 10, 2020, Ko and her counsel, Choi, executed the Acknowledgement.  (*See* R. 154–56.)  The Acknowledgement, among other things, provided:

> The Trustee has agreed to adjourn the Original Closing Date to the Outside Date. **TIME SHALL BE OF THE ESSENCE WITH REGARD TO PURCHASER'S OBLIGATION TO CLOSE ON THE SALE OF THE REAL PROPERTY ON THE OUTSIDE DATE**, on the conditions set forth herein including, without limitation, that I, as Purchaser, agree to and deliver to Trustee [*i.e.*, Appellee] an additional deposit of $2,730,000 (the "Additional Deposit"), which will be tendered to the Trustee [*i.e.*, Appellee], via a wire transfer (instructions annexed hereto), today (June 10, 2020).  **TIME OF THE ESSENCE [*sic*] WITH REGARD TO PURCHASER'S OBLIGATION TO DELIVER THE ADDITIONAL DEPOSIT TO TRUSTEE ON SUCH DATE;**
>
> . . .
>
> If for any reason, or no reason at all, I, as Purchaser, fails or refuses [*sic*] to comply in all respects with (i) the terms and conditions of this agreement; (ii) the terms and conditions of the Sale Confirmation Order; (iii) the Stalking Horse Agreement; or (iv) the [Sale Terms] then, in either of such events, an event of default by me, as Purchaser, shall exist and as a result thereof [] I shall forfeit its right to, and shall not be entitled to, purchase the Real Property from the Trustee; and I shall forfeit all rights in and to acquiring the Real Property from Trustee and shall forfeit all sums paid to the Trustee including without limitation the Deposit (defined herein), the Buyer's Premium (defined herein) and the Additional Deposit;
>
> I, as Purchaser, hereby and irrevocably waive any and all rights, claims and interest in and to the Deposit of $2,730,000, the Buyer's Premium of $1,092,000 and the Additional Deposit of $2,730,000 (collectively the "Funds") and agree and acknowledge that the Funds are property of the bankruptcy estate of 41-23 Haight

Street Realty Inc. [*i.e.*, Debtor] and the Trustee may distribute and use such Funds as the Trustee deems appropriate . . . .

(R. 154–55 (formatting in original).)  Appellant Xu was not a signatory to the Acknowledgement. (*See* R. 156.)  According to Appellant Xu, he was advised by Ko and his attorney in June 2020 that an extension of the Closing Date, along with an additional deposit, would be required, but Appellant never received a copy of the Acknowledgement.  (R. 190–91.)  He also was not advised that the Additional Deposit was due on June 10, 2020.  (R. 191.)

On the morning of June 11, 2020, Appellee-Trustee confirmed that Ko had not paid the Additional Deposit, and therefore was in default.  (R. 125.)  On June 12, 2020, Appellee-Trustee filed a letter with the Bankruptcy Court advising that Ko was in default and that the sale of the Real Property to Ko would not proceed.  (R. 26, 246.)  Thereafter, on June 30, 2020, Appellee-Trustee moved the Bankruptcy Court for an order authorizing Appellee-Trustee, on behalf of the Debtor's estate, to retain the Deposit and Buyer's Premium of $3,822,000 "as liquidated damages," based upon the default under the Sale Terms, Stalking Horse Agreement, Stalking Horse Order (entered on May 8, 2020), Sale Confirmation Order (entered on May 19, 2020), and Acknowledgement.  (R. 29, 117–28.)

On July 8, 2020, Appellant Xu filed a partial objection to Appellee-Trustee's motion and cross-moved for an order directing Appellee-Trustee to return the $2,119,000 in funds that Appellant had remitted through JCBD Investment Inc.  (R. 32, 176–87.)  Appellant Xu argued that: (1) he was not a party to the applicable agreements and orders of the Bankruptcy Court, and therefore was not bound by their terms; (2) principles of equity required Appellee-Trustee to reimburse Appellant Xu to avoid an unjust enrichment; and (3) the deposit-forfeiture provisions of the applicable agreements and orders were unenforceable penalties and void as a matter of law. (R. 180–86.)

8

On July 13, 2020, Appellee-Trustee responded to Appellant Xu's partial objection and cross-motion, arguing that (1) Appellant Xu, by "hid[ing] in the bushes" and not coming forward sooner, had "sat on whatever rights and claims" he had in the funds at issue (R. 284–85, 287); (2) Ko had represented that she funded the Deposit, and "there was no reason for [Appellee-Trustee] or any other party to suspect that anyone other than Ko funded the Deposit" (R. 288); and (3) to the extent Appellant Xu had any claims, they were against Ko, not the Debtor's estate (R. 285, 289).  Appellee-Trustee's response also noted the relationship between the various parties— notably, that Ko was mother of Andy Chau, former principal of the Debtor, and grandmother of Selena Chau, one of the Initial Offerors.  (*See* R. 284 n.2, 285.)  On the same day, 41-31 Haight Street Lender, LLC ("Lender"), the first priority lienholder on all proceeds from the sale of the Real Property (R. 96), filed a statement joining Appellee-Trustee's motion (R. 33–34, 250–63).

The Bankruptcy Court held hearings on July 14, 17, and 20, 2020.  (R. 34–36.)  At the hearing on July 20, 2020, the Bankruptcy Court granted Appellee-Trustee's motion—ruling that Appellee-Trustee, on behalf of the Debtor's estate, could retain the $3,822,000 in funds "because there was a clear default" under the Stalking Horse Order and Sale Confirmation Order.  (R. 374– 79.)

The Bankruptcy Court also overruled Appellant Xu's partial objection and cross-motion. First, the Bankruptcy Court noted that any claim regarding "the potentially fraudulent means by which Ko obtained the money from [Appellant Xu] [was] not before" the Bankruptcy Court, and that Ko's counsel had "expressly confirmed" that the funds deposited with Appellee-Trustee in connection with the sale of the Real Property "came from Ko herself."  (R. 383–84.)  The Bankruptcy Court therefore concluded that principles of equity favored overruling Appellant Xu's objection; to do otherwise would be to create "a dangerous preceden[t] permitting Stalking Horse

bidders to potentially collude with an outside party to obtain the money for a deposit while allowing the Stalking Horse bidder to later default on the agreement and the outside party to receive back the monies paid, leaving the Trustee or Debtor in possession with the resulting consequences."  (R. 384.)  Second, the Bankruptcy Court rejected Appellant Xu's argument that the deposit-forfeiture provisions were unenforceable and unlawful, given that both case law and public policy "emphasize the importance of enforcing the finality of bankruptcy sales."  (R. 385– 86.)  The Bankruptcy Court determined that any equitable factors that might warrant a different result were lacking because the applicable sale terms were clear, the court orders incorporating those terms were unchallenged, and even though Appellant Xu was not deemed to be a Stalking Horse Bidder, "he intended to be."  (R. 387–90.)  Finally, the Bankruptcy Court rejected Appellant Xu's claim of unjust enrichment, concluding that there was "no evidence that allowing [Appellee-Trustee] to retain the Stalking Horse deposit [would be] contrary to principle[s] [of] equity."  (R. 390–91.)  As the Bankruptcy Court found, Appellant Xu "was represented by counsel and was fully aware that this money was a deposit, even if he was unaware that Ko removed his name from the Stalking Horse Agreement . . . ."  (R. 391.)  The Bankruptcy Court denied an oral motion for a stay pending appeal.  (R. 393.)

On July 24, 2020, the Bankruptcy Court entered an order (the "Deposit Order") authorizing Appellee-Trustee to retain the Deposit and Buyer's Premium of $3,822,000.  (R. 37, 424–26.) Appellant Xu timely filed a Notice of Appeal with respect to the Deposit Order on July 31, 2020. (R. 427–29; *see also* Dkt. 1, at 1–3.)

Following the filing of the Notice of Appeal, a virtual public auction of the Real Property was held on August 5, 2020, and the Real Property was sold for $28,100,000 plus a 4% buyer's premium of $1,124,000.  The Bankruptcy Court entered an order confirming the sale on August

13, 2020, and the transaction successfully closed on September 14, 2020.[6]  The successful purchaser of the Real Property was Appellant Xu's purported company, "JCBD Investment Inc./Jinyu Zhang or Its Designee."[7]  (R. 41.)

On appeal, Appellant Xu argues that (1) the Bankruptcy Court erred in determining that Appellee-Trustee was entitled to retain the Deposit and Buyer's Premium based on agreements and orders to which Appellant Xu was not a party; (2) the Bankruptcy Court erred in concluding that principles of equity, including unjust enrichment, favored Appellee-Trustee and did not require disgorgement of $2,119,000 to Appellant; and (3) the Bankruptcy Court erred in enforcing what Appellant Xu claims are unenforceable penalty provisions.  (*See* Appellant Br., Dkt. 4, at 14–26.)  Appellee-Trustee argues that (1) Appellant Xu, as a non-party to the Stalking Horse Agreement, lacks prudential standing to challenge the Agreement or orders of the Bankruptcy Court; (2) the Bankruptcy Court correctly concluded that the equities favored Appellee-Trustee; and (3) the relevant provisions were valid and enforceable liquidated damages provisions. (Appellee Br., Dkt. 6, at 15–24.)

## DISCUSSION

### I.  Standard of Review

"District courts have appellate jurisdiction over 'final judgments, orders, and decrees' entered in bankruptcy court."  *Satti v. Nechadim Corp.*, No. 17-CV-683 (MKB), 2018 WL

---

[6]  The foregoing facts in the instant paragraph were included in the record by agreement of the parties and approval of the Court by order on October 2, 2020.  (*See* Dkt. 3, at 1; 10/2/2020 Docket Order.)

[7]  Following the virtual public auction conducted on August 5, 2020, Appellee-Trustee filed an affirmation in the Bankruptcy Court to confirm the results of the auction.  (R. 40; Bankr. Dkt. 251.)  This affirmation included declarations from Jinyu Zhang (Bankr. Dkt. 251-2) and "John Xu," "Chief Executive Officer of JCBD Investment, Inc." (Bankr. Dkt. 251-3).

1010206, at *3 (E.D.N.Y. Feb. 16, 2018) (quoting 28 U.S.C. § 158(a)).  A bankruptcy court's order is final "if it 'completely resolve[s] all of the issues pertaining to a discrete claim, including issues as to the proper relief.'"  *Pegasus Agency, Inc. v. Grammatikakis* (*In re Pegasus Agency, Inc.*), 101 F.3d 882, 885 (2d Cir. 1996) (alteration in original) (quoting *Dicola v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n* (*In re Prudential Lines, Inc.*), 59 F.3d 327, 331 (2d Cir. 1995)); *see also Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 587 (2020) ("Congress made orders in bankruptcy cases immediately appealable if they finally dispose of discrete disputes within the larger bankruptcy case." (internal alterations, quotation marks, and citations omitted)).

In reviewing a decision of the bankruptcy court, the district court reviews legal conclusions *de novo*, but reviews factual findings only for clear error.  *Lubow Mach. Co. v. Bayshore Wire Prods. Corp.* (*In re Bayshore Wire Prods. Corp.*), 209 F.3d 100, 103 (2d Cir. 2000).  The clear-error standard means that the reviewing court does not reweigh the evidence; rather, a factual finding is clearly erroneous only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *See Bordonaro v. Fido's Fences, Inc.*, 565 B.R. 222, 230 (E.D.N.Y. 2017) (quoting *Dist. Lodge 26, Int'l Ass'n of Machinists & Aerospace Workers v. United Techs. Corp.*, 610 F.3d 44, 51 (2d Cir. 2010)).  "Mixed questions of fact and law are subject to *de novo* review."  *Babitt v. Vebeliunas* (*In re Vebeliunas*), 332 F.3d 85, 90 (2d Cir. 2003) (citing *FDIC v. Providence Coll.*, 115 F.3d 136, 140 (2d Cir. 1997)).  When a bankruptcy court's decision is based on an exercise of its equitable authority, that decision is reviewed only for abuse of discretion.  *Adelphia Bus. Sols., Inc. v. Abnos*, 482 F.3d 602, 607 (2d Cir. 2007) (citations omitted).  "A bankruptcy court abuses its discretion if its decision rests on an error of law or a clearly erroneous factual finding or cannot be located within the range of

permissible decisions." *Wilk Auslander LLP v. Murray* (*In re Murray*), 900 F.3d 53, 59 (2d Cir. 2018) (citing *Schwartz v. Geltzer* (*In re Smith*), 507 F.3d 64, 73 (2d Cir. 2007)).

Finally, this Court "may affirm on any ground that finds support in the record." *Barclays Cap. Inc. v. Giddens* (*In re Lehman Bros. Holdings Inc.*), 761 F.3d 303, 308 (2d Cir. 2014) (citing *McElwee v. County of Orange*, 700 F.3d 635, 640 (2d Cir. 2012)); *see also Holzer v. Barnard*, 582 B.R. 37, 42 (E.D.N.Y. 2018) ("[T]he Court may affirm on any ground that finds support in the record, and need not limit its review to the bases raised or relied upon in the decisions below." (citations omitted)).

## II.    Standing

As an initial matter, Appellee-Trustee argues that because Appellant Xu is not a party to the relevant agreements and is not named as a Stalking Horse Bidder or Purchaser in the relevant orders of the Bankruptcy Court, he "does not have the requisite standing to challenge the Bankruptcy Court's ruling." (Appellee Br., Dkt. 6, at 16.)  Though "contractual standing" may be necessary for a bankruptcy appeal, this argument is a red herring in this case.

It is well-established that "only parties to the contract and intended third-party beneficiaries have prudential standing to appear and enforce agreements." *In re Corp. Res. Servs., Inc.*, No. 15-12329 (MG), 2019 WL 5095709, at *5 (Bankr. S.D.N.Y. Oct. 10, 2019) (citing *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009)), *aff'd*, No. 19-CV-10931 (ER), 2020 WL 5211044 (S.D.N.Y. Sept. 1, 2020), *aff'd*, 849 F. App'x 320 (2d Cir. 2021) (summary order); *see also Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79, 86 (2d Cir. 2014) ("[T]he rule adhered to in New York [is] that the terms of a contract may be enforced only by contracting parties or intended third-party beneficiaries of the contract." (internal citations omitted)).  Indeed, "under both federal common law and New York law, third party non-beneficiaries cannot adjudicate contractual issues even when that third party's financial interest is arguably at stake." *In re Motors*

13

*Liquidation Co.*, 580 B.R. 319, 341 (Bankr. S.D.N.Y. 2018) (collecting cases).  This concept of standing, which the Second Circuit recently termed "contractual standing," is distinct from the jurisdictional concerns of Article III standing: instead of dealing with whether a court has the power to adjudicate a controversy, it deals with "whether a party has the right to enforce a contract."  *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020).  In other words, "contractual standing speaks to a party's right to relief for breach of contract."  *Id.*

But, here, Appellant Xu is not seeking to enforce, or obtain relief based on, any agreement or contract.  Rather, he is simply arguing that because he is not a party to certain agreements, it would be unfair or inequitable for those agreements to form the basis on which Appellee-Trustee may retain funds that purportedly came from Appellant Xu.  (*See generally* R. 180–84; Appellant Br., Dkt. 4, at 16–22.)  Nothing about Appellant's argument, or the relief he seeks, depends on enforcement of those agreements, and therefore, an argument that Appellant Xu lacks "contractual" or "prudential" standing is inapposite.  *Cf. Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, N.A.*, 747 F.3d 44, 48–49 (2d Cir. 2014) (concluding that appellant lacked "prudential standing" where it could not enforce a contract, yet the enforcement of the contract was "a necessary component of its claim").

This, however, does not end the standing inquiry.  "To have standing to appeal from a bankruptcy court ruling in this Circuit, an appellant must be an 'aggrieved person,' a person 'directly and adversely affected pecuniarily' by the challenged order of the bankruptcy court." *Licensing by Paolo, Inc. v. Sinatra* (*In re Gucci*), 126 F.3d 380, 388 (2d Cir. 1997) ("*Gucci II*") (quoting *Kabro Assocs. v. Colony Hill Assocs.* (*In re Colony Hill Assocs.*), 111 F.3d 269, 273 (2d Cir. 1997)); *see also Kane v. Johns-Manville Corp.*, 843 F.2d 636, 641 (2d Cir. 1988) ("A person who seeks to appeal an order of the bankruptcy court must be 'directly and adversely affected

14

pecuniarily' by it." (citation omitted)).  This prudential rule "reflect[s] the understandable concern that if appellate standing is not limited, bankruptcy litigation will become mired in endless appeals brought by the myriad of parties who are indirectly affected by every bankruptcy court order." *Colony Hill*, 111 F.3d at 273 (alteration in original) (quoting *Kane*, 843 F.2d at 642); *see also DISH Network Corp. v. DBSD N. Am., Inc.* (*In re DBSD N. Am., Inc.*), 634 F.3d 79, 88–89 (2d Cir. 2011) (explaining that the rule of appellate standing in the bankruptcy context was adopted "for practical reasons").

Here, there is some question whether Appellant Xu is a person "directly and adversely affected pecuniarily" by the Bankruptcy Court's Deposit Order.  Appellant Xu asserts that "[t]here is no dispute that [he] funded $2.1 million toward the deposit required by the Stalking Horse Agreement."  (Reply Brief of Appellant Ling Xiang Xu ("Appellant Reply"), Dkt. 8, at 5.)  But this is actually a contested proposition.  (*See* Appellee Br., Dkt. 6, at 2 ("[E]ven if the estate was enriched, there was no evidence that it was at the expense of the Appellant. . . . Further, Ko, through her counsel, represented to the Bankruptcy Court that all of the Funds came from Ko directly."); *id.* at 9–10 ("The Appellee, his counsel and the Co-Brokers had no knowledge of the Appellant's 'purported' investment in and to the Deposit, nor does the Appellant claim that the Appellee had such knowledge.  Further, the Appellant's name does not appear on any of the bank checks or wire transfers made by Ko to the Appellee."); *see also* R. 284 ("The Trustee has no reason to believe that Xu partially funded the Deposit.  Indeed, Ko, through counsel, represented to [the Bankruptcy Court] that she was the only stalking horse bidder and that she alone funded the Deposit."); R. 287 ("Despite Xu's assertion that he was the source of the $1,319,000 check dated April 28, 2020, that check was from JCBD Investment Inc., <u>not Xu</u>.  Xu has provided very little, if any, evidence that he actually provided these monies to Ko.").)

15

In the end, however, because the Court concludes that the Bankruptcy Court did not abuse its discretion or otherwise err in determining that Appellee-Trustee was not legally obligated to remit $2,119,000 to Appellant Xu, the Court need not, and declines to, decide the appellate standing issue.  Moreover, in light of the prudential, as opposed to jurisdictional, nature of the doctrine, its resolution is not a prerequisite to reaching the merits.  Indeed, in *Colony Hill*, a case involving whether an unsuccessful stalking horse bidder had standing to challenge the "intrinsic fairness" of the sale transaction, the Second Circuit noted that the determination of appellate standing and the merits in such cases "merge."  111 F.3d at 274 (citing *McDonnell v. Hotin* (*In re Hotin*), 63 B.R. 226, 227 n.2 (D. Mass. 1986)).  Here, the Court finds that an evaluation of the merits is unavoidable, and in truth, the difference between concluding that Appellant Xu lacks standing to challenge the Bankruptcy Court's order and concluding that the Bankruptcy Court made a sound decision in not requiring Appellee-Trustee to remit $2,119,000 to Appellant Xu is just semantics.

## III.    Merits

To start, as the Bankruptcy Court correctly concluded, the issue here is not one that sounds in contract—indeed, for the reasons discussed above, Appellant Xu would lack standing to bring a contract claim.  Instead, as the Bankruptcy Court noted, Appellant Xu might have a tort claim for fraud against Ko, but such a claim was not properly before the Bankruptcy Court.  (*See* R. 384 ("[T]he potentially fraudulent means by which Ko obtained the money from [Appellant Xu] is not before this Court.").)  Moreover, the Bankruptcy Court concluded that, to the extent Appellant Xu was appealing to its equitable power, the "principles of equity," in fact, favored Appellee-Trustee, because finding in Appellant Xu's favor would "creat[e] a dangerous preceden[t] permitting Stalking Horse bidders to potentially collude with an outside party to obtain the money for a deposit while allowing the Stalking Horse bidder to later default on the agreement and the outside

16

party to receive back the monies paid, leaving the Trustee or Debtor in possession with the resulting consequences."  (*Id.*)

This determination does not rest on an error of law or a clearly erroneous factual finding, nor is it outside "the range of permissible decisions."  *See Murray*, 900 F.3d at 59.  "Section 105(a) of the Bankruptcy Code gives the [bankruptcy] court equitable power to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code].'" *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc.* (*In re Dairy Mart Convenience Stores, Inc.*), 351 F.3d 86, 91–92 (2d Cir. 2003) (quoting 11 U.S.C. § 105(a)).  The Second Circuit has "repeatedly emphasized the importance of the bankruptcy court's equitable power." *Momentum Mfg. Corp. v. Emp. Creditors Comm.* (*In re Momentum Mfg. Corp.*), 25 F.3d 1132, 1136 (2d Cir. 1994) (citing *Off. Comm. of Unsecured Creditors v. PSS S.S. Co.* (*In re Prudential Lines Inc.*), 928 F.2d 565 (2d Cir. 1991)).  While this equitable power is not unbounded, *see Dairy Mart*, 351 F.3d at 92 (bankruptcy courts' equitable power "does not authorize [them] to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity" (internal quotation marks and citation omitted)), "Section 105(a) should be 'construed liberally to enjoin [actions] that might impede the reorganization process,'" *Momentum Mfg.*, 25 F.3d at 1136 (alteration in original) (quoting *Prudential Lines*, 928 F.2d at 574).  A bankruptcy court's equitable authority under Section 105(a) includes authority and discretion to establish and monitor guidelines for sales of property from the debtor's estate.  *See In re Target Two Assocs., L.P.*, No. 04-CV-8657 (SAS), 2006 WL 3068668, at *5 (S.D.N.Y. Oct. 27, 2006), *aff'd*, 282 F. App'x 914 (2d Cir. 2008); *Wes-Flo Co. v. Wilson Freight Co.* (*In re Wilson Freight Co.*), 30 B.R. 971, 974 n.6 (Bankr. S.D.N.Y. 1983).  The Bankruptcy Court's refusal here to require Appellee-Trustee to remit $2,119,000 to Appellant Xu falls well within that court's

authority and discretion under Section 105(a) to monitor sales of the debtor's property and, more generally, to enjoin actions that might impede the reorganization process.

Of course, as Appellant Xu points out, "a contract cannot bind a nonparty."  (Appellant Br., Dkt. 4, at 20 (quoting *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)).)  But contrary to Appellant Xu's characterization, the Bankruptcy Court's Deposit Order did not "bind" Appellant to any contract.  Indeed, based on the record before it, the court did not find that Appellant Xu was a party to the Stalking Horse Agreement or subject to the terms of that agreement, the Acknowledgement, or any other contract.  Rather, as the Bankruptcy Court made clear, "principles of equity" compelled it to avoid "creating a dangerous preceden[t] permitting Stalking Horse bidders to potentially collude with an outside party to obtain the money for a deposit," and leaving the debtor's estate to bear the consequences when those bidders default.  (*See* R. 384; *see also* R. 424–26.)  The facts of this case amply show the soundness of this decision.  To start, as the Bankruptcy Court noted, Ko unquestionably defaulted under the explicit terms of the Stalking Horse Order, Stalking Horse Agreement, Sale Terms, and Sale Confirmation Order.  (R. 374, *see also* R. 424.)  Moreover, Ko's counsel "expressly confirmed" that Ko "alone provided the funds in connection with the sale of [the Real Property]."  (R. 384.)  And as for Appellant Xu, he initially signed the Stalking Horse Agreement, was represented by counsel, and was "fully aware" of the nature of any deposits, even if he was unaware that Ko removed his name from the Agreement.  (R. 388, 391.)  None of these findings are clearly erroneous.  (*See* R. 189, 195–203, 301.)  In fact, Appellant admits that, at the time the Stalking Horse Agreement was initially executed, he and Ko were represented by the same counsel, Xiangan Gong, Esq.—who, as it turns

out, also represented the Initial Offerors.[8]  (*See* R. 22, 189.)  Further, although Appellant claims *he* provided the $2,119,000 in funds, both the cashier's check for $1,319,000 dated April 28, 2020 (which was deposited into the Appellee-Trustee's account at Mechanics Bank) and the wire transfer of $800,000 on May 14, 2020 (which was sent to an account at Rabobank, N.A.[9]) in fact came from JCBD Investment Inc.[10]  (*See* R. 188–89, 205–06, 290–91.)  The wire transfer on May 14, 2020, moreover, occurred after Ko removed Appellant Xu's name from the Stalking Horse Agreement, after the public auction sale took place, and just when Ko needed to remit the Buyer's Premium to Appellee-Trustee.  (*See* R. 189–90, 206, 726–28.)  Considering all the facts of this case, the Court finds that the Bankruptcy Court's weighing of the equities in light of the goals of the Bankruptcy Code is sound, and it did not abuse its discretion in declining to give dispositive weight to the fact that Appellant Xu—a sophisticated, well-represented party—was removed from the Stalking Horse Agreement.

Likewise, the Bankruptcy Court did not misapply "general principles of equity."  (*See* Appellant Br., Dkt. 4, at 21.)  Indeed, despite Appellant Xu's assertion that "equity must intervene to prevent injustice" (*id.*), a bankruptcy court's equitable power under Section 105(a) of the Bankruptcy Code, though broad, "must and can only be exercised within the confines of the Bankruptcy Code," *Dairy Mart*, 351 F.3d at 92 (citation omitted); *accord Norwest Bank*

---

[8]  The inter-relatedness of all parties involved in the attempted purchase of the Real Property, including the ultimate purchaser, JCBD Investment, which Appellant Xu claims is his company, reinforces the wisdom of the Bankruptcy Court's decision to exercise its equitable power to prevent collusion between potential bidders.

[9]  As previously noted, there is nothing in the record to explain why Appellant Xu wired $800,000 to this account.

[10]  As noted, it appears that the "Chief Executive Officer" of JCBD Investment Inc. is one "John Xu."  *See supra* note 7 (citing Bankr. Dkt. 251-3).  The relationship between "John Xu" and Appellant Liang Xiang Xu is unclear.

*Worthington v. Ahlers*, 485 U.S. 197, 206 (1988).  Such power is not "a roving commission to do equity," *Dairy Mart*, 351 F.3d at 92, but rather a broad authority to *effectuate the goals of the Bankruptcy Code* fairly and justly, *see Momentum Mfg.*, 25 F.3d at 1136.  The Bankruptcy Court did not run afoul of these principles in declining to require Appellee-Trustee under the facts and circumstances here to remit the requested funds to Appellant Xu, which the Bankruptcy Court recognized would "creat[e] a dangerous preceden[t]" permitting collusion that could harm a debtor's estate.  (*See* R. 384); *Dairy Mart*, 351 F.3d at 91–92 (explaining that § 105(a) of the Bankruptcy Code "gives the [bankruptcy] court equitable power to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code].'" (quoting 11 U.S.C. § 105(a)).

The Bankruptcy Court also did not err in determining that there was no unjust enrichment. Under New York law, there is unjust enrichment if "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."  *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) (citing *Clark v. Daby*, 751 N.Y.S.2d 622, 623 (N.Y. App. Div. 2002)); *accord Kaplan v. Reed Smith LLP*, 919 F.3d 154, 160 (2d Cir. 2019) (per curiam).  Here, the Bankruptcy Court rested its decision on the third element, concluding that "even if [the debtor's estate] were [enriched] and . . . at [Appellant Xu's] expense, there's no evidence that allowing [Appellee-Trustee] to retain the Stalking Horse deposit is contrary to principle[s] [of] equity."  (*See* R. 391.) Indeed, as the Bankruptcy Court noted, Appellant Xu "was represented by counsel" and was "fully aware" that funds paid to Appellee-Trustee in advance of the closing of the sale served as a deposit, even if Appellant Xu was unaware that Ko had removed his name from the Stalking Horse Agreement.  (*Id.*)  These findings are not clearly erroneous.  (*See* R. 189; *see also* R. 195–203

(Appellant initially signing the Stalking Horse Agreement, including the annexed Sale Terms).) Had Appellant Xu believed he was still a Stalking Horse Bidder, it was his responsibility to close within the period established under the Stalking Horse Agreement, so as not to lose any deposit. That Appellant Xu and Ko were represented by the same real estate attorney further weakens any argument by Appellant Xu that any funds he put toward the deposit should be returned to him. Moreover, to the extent that Appellant Xu argues that he was defrauded by Ko, such a claim was not properly before the Bankruptcy Court—as it emphasized (R. 384)—and thus is not properly before this Court.  Because the Bankruptcy Court did not apply a wrong legal principle or base its conclusion on clearly erroneous factfinding, it did not abuse its discretion or otherwise err in concluding there is no *unjust* enrichment.  *See Murray*, 900 F.3d at 59.

Finally, Appellant Xu's argument that the Bankruptcy Court improperly enforced unenforceable penalty provisions against him is misplaced and unavailing.  (*See generally* Appellant Br., Dkt. 4, at 22–26; Appellant Reply, Dkt. 8, at 8–13.)  As an initial matter, this argument is premised on the assumption that Appellant Xu is bound by the terms of the Stalking Horse Agreement and attached Sale Terms, the Stalking Horse Order, the Sale Confirmation Order, and the Acknowledgement.[11]  (*See* Appellant Br., Dkt. 4, at 22–23; Appellant Reply, Dkt. 8, at 8.)  But the terms of those agreements and orders are not properly before this Court for review. As the Second Circuit has repeatedly recognized, "appellate jurisdiction over an *unstayed* sale order issued by a bankruptcy court is statutorily limited to the narrow issue of whether the property was sold to a good faith purchaser."  *Licensing by Paolo, Inc. v. Sinatra* (*In re Gucci*), 105 F.3d

---

[11]  As explained above, despite Appellant Xu's characterization, the Bankruptcy Court's Deposit Order on appeal here did not in fact "bind" Appellant Xu to any contract, but rather determined as a matter of equity that Appellee-Trustee did not need to remit $2,119,000 in funds to Appellant Xu.  (*See* R. 384, 424–26.)

837, 839 (2d Cir. 1997) ("*Gucci I*") (citing 11 U.S.C. § 363(m); *United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991)); *accord Contrarian Funds LLC v. Aretex LLC* (*In re WestPoint Stevens, Inc.*), 600 F.3d 231, 247 (2d Cir. 2010); *Colony Hill*, 111 F.3d at 272.  In other words, "regardless of the merit of an appellant's challenge to a sale order, [an appellate court] may neither reverse *nor modify* the judicially-authorized sale if the entity that purchased or leased the property did so in good faith and if no stay was granted."  *Gucci I*, 105 F.3d at 840 (emphasis added).  Such a rule "furthers the policy of finality in bankruptcy sales and assists the bankruptcy court to secure the best price for the debtor's assets."  *Id.* (citing *Salerno*, 932 F.2d at 123); *accord Colony Hill*, 111 F.3d at 272.  Appellant Xu did not seek a stay of either the Stalking Horse Order or the Sale Confirmation Order.  Moreover, Appellant Xu raised no challenge below to the Bankruptcy Court's explicit finding that Ko was a good-faith buyer (*see* R. 146), nor does he argue here that Ko purchased the Real Property in bad faith.

In any event, Appellant's argument that the deposit-forfeiture provisions are unenforceable penalty provisions is unavailing.  "Courts repeatedly emphasize the importance of enforcing the finality of bankruptcy sales," and "[w]ith respect to buyers at such sales who fail to complete their purchase of real property, courts pursue this policy of finality by strict enforcement of the terms of sale against the buyer."  *Target Two*, 2006 WL 3068668, at *6 (citations omitted); *see also In re Oyster Bay Cove, Ltd.*, 161 B.R. 338, 345 (Bankr. E.D.N.Y. 1993) ("The Trustee is authorized to retain the deposit of [the defaulting purchaser] in the amount of $250,000 as liquidated damages."), *aff'd*, 196 B.R. 251 (E.D.N.Y. 1996).  Although "courts have recognized that equitable considerations might lead to a different result in extraordinary cases," *Target Two*, 2006 WL 3068668, at *6 (citation omitted), the Bankruptcy Court here acted well within its discretion in concluding that there were no such equitable considerations that compelled a modification of the

terms of the sale, under which there was a clear default (*see* R. 387–90).  Indeed, as Appellee-Trustee pointed out in his briefing before the Bankruptcy Court, "Xu never appeared in the case, never filed an objection at any time throughout the sale process, and never contacted [Appellee-Trustee] or his retained professionals.  Instead, Xu hid in the bushes and did nothing for 3 months." (R. 284.)

Appellant makes much of the fact that the Real Property ended up being sold for $28,100,000—or $800,000 above the purchase price of $27,300,000 under the Stalking Horse Agreement.  (*See* Appellant Br., Dkt. 4, at 24–26; Appellant Reply, Dkt. 8, at 8–13.)  Appellant Xu uses this fact to argue that Appellee-Trustee has received a "windfall" that renders the deposit-forfeiture provisions unenforceable penalties.  (*See* Appellant's Reply, Dkt. 8, at 8–13; *see also* Appellant Br., Dkt. 4, at 26.)  Even assuming that this *post hoc* argument is properly before the Court, it is inapposite.  In the context of bankruptcy sales, given the importance of finality, courts have determined that defaulting purchasers, not the trustee of a debtor's estate, should bear the risk of fluctuating market conditions.  *Cf. Balaber-Strauss v. Markowitz* (*In re Frankel*), 191 B.R. 564, 573–74 (Bankr. S.D.N.Y 1995) (requiring specific performance because "the risk" of "different" market conditions "should be borne by the defaulting purchaser," and also because the trustee should not be required "to suffer the nuisance, cost and delay attendant upon yet another auction of the property, particularly when one considers that any prospective purchaser might engage in the same tactics of delay and ultimate breach"); *Maxton Builders, Inc. v. Galbo*, 502 N.E.2d 184, 189 (N.Y. 1986) (noting that if a real-estate sale agreement "expressly" allows the seller to retain a down payment in the event of the buyer's default, "the provision would probably be upheld as a valid liquidated damages clause in view of the recognized difficulty of estimating actual damages and the general acceptance of the traditional 10% down payment as a reasonable amount").

Accordingly, deposit-forfeiture provisions are not unenforceable simply because it later turned out that the property or asset sold for a higher price.  In fact, as the court in *Target Two* recognized, deposits in these types of cases, far from being penalties, are like purchasing an option, which can have value.  *See* 2006 WL 3068668, at *6.  But even accepting Appellant Xu's premise that deposit-forfeiture provisions are unenforceable penalties when the debtor's estate experiences a "windfall," the Court has no basis to find that Appellee-Trustee received a "windfall" from the mere fact that the Real Property ended up selling for $800,000 above the price under the Stalking Horse Agreement, particularly considering the unknown costs—such as taxes and interest on loans—that Appellee-Trustee, on behalf of the Debtor's estate, may have borne as a result of the default and several months' delay in selling the Real Property.  (*See* R. 364–71.)  Similarly, Appellant Xu's argument that Appellee-Trustee suffered no actual damages is no reason to disturb the Bankruptcy Court's decision that Appellee-Trustee need not remit $2,119,000 to Appellant Xu.[12]

*     *     *

Despite the different trappings of Appellant Xu's various arguments, they all essentially boil down to one issue: Did the Bankruptcy Court abuse its discretion in declining to exercise its equitable authority in favor of Appellant Xu?  It plainly did not.  In fact, the Court strongly agrees

---

[12]  Although $28,100,000 is $800,000 above the price under the Stalking Horse Agreement, it is more than $2,119,000 below the $31,000,000 purchase price to which the Initial Offerors agreed, even before accounting for the 4% buyer's premium in each case.  As noted, the ultimate purchaser of the Real Property appears to be JCBD Investment Inc., which is purportedly Appellant Xu's company.  (*See* R. 41, 189; *see also* Appellant Br., Dkt. 4, at 8–9.)  In light of the facts in this case, Appellant Xu's assertion that $2.1 million is "a crippling blow to his business during the economic downturn brought on by the COVID-19 pandemic" is entirely uncompelling, if not suspect.  (*See* Appellant Br., Dkt. 4, at 20.)

with the Bankruptcy Court's conclusion that here "the equitable considerations that might warrant a different result are not present."  (R. 387.)

## CONCLUSION

The order of the Bankruptcy Court declining to require Appellee-Trustee to remit $2,119,000 in funds to Appellant Xu is affirmed.  The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 29, 2021
Brooklyn, New York

25